# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

| | |
|---|---|
| **CHARLES CRABLE,** | **CASE NO.: 6:16-cv-1825-orl-22TBS** |
| **Plaintiff,** | |
| v. | |
| **PREMIER BATHS, INC., d/b/a PREMIER CARE IN BATHING, and BILL KELLY,** | |
| **Defendants.** | |
| _____/ | |

## AMENDED COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff, Charles Crable (hereinafter "Plaintiff") by and through the undersigned counsel and files this Amended Complaint and sues Defendants PREMIER BATHS, INC., d/b/a PREMIER CARE IN BATHING (hereinafter "Premier") and BILL KELLY (hereinafter "Kelly") and states as follows:

## JURISDICTION

1. This is a civil action seeking damages. Jurisdiction is conferred on this Court by the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* and 28 U.S.C. §§ 1331, 1337, and 1350. Venue is proper in the Middle District of Florida as stipulated in the contract.

## PARTIES

2. At all relevant times, Plaintiff Charles Crable, was and is a resident of Cortland County in the State of New York.

3. At all relevant times, Defendant Premier Care in Bathing ("Premier") is a Florida corporation employing more than 25 people. Premier was, at all relevant times, licensed to do business, was and is doing business, by virtue of the laws of the State of New York, and in Cortland, County and all counties in the State of New York.

4. At all relevant times, Defendant Bill Kelly was and is a resident of the State of Rhode Island.

## FACTUAL ALLEGATIONS

5. Plaintiff commenced employment as a sales representative with Defendant Premier on July 31, 2014.

6. At the initial interview with Defendant Kelly, Defendant Kelly asked Plaintiff if he was just looking for a job or if he was interested in Premiere specifically. Plaintiff responded that he had sought this company (Premiere) out on two separate occasions and wanted to have this position be the last one of Plaintiff's career and that Plaintiff really liked the particular industry.

7. Defendant Kelly told me that Plaintiff would have 10 to 12 leads/appointments a week and that Plaintiff would be making $90,000.00

during the first year.

8. Defendant Kelly advised that one of Plaintiff's conditions of employment was driving distances and was told by Defendant Kelly that he would be working in and around Binghamton and Syracuse, New York, traveling not to exceed 80 miles.

9. Plaintiff told Defendant Kelly he was ready to work for Premier.

10. After this exchange, Defendant Kelly and Plaintiff shook hands, and he started working.

11. Defendant Kelly had the power to hire Plaintiff, and did hire Plaintiff.

12. Defendant Kelly reviewed and cherry picked leads/appointments for Plaintiff.

13. Based upon what Defendant Kelly decided was the number of leads/appointments Plaintiff would have, Defendant Kelly determined what and how Plaintiff was to be compensated.

14. At all times during his employment with Defendant Premier, Plaintiff competently and diligently performed his duties. Plaintiff was regularly complimented verbally and in writing from Defendant Kelly and Premier Vice President Gary Reda for a job well done. Plaintiff won bonuses and awards from Premier beginning the first month of employment. Plaintiff

was terminated without notice in violation of the Defendant's own contract on October 17, 2014.

15. The Defendants required that Plaintiff work out of his own established home office to work with Premier selling walk-in bathtubs to the aged and disabled. There were equipment requirements, such as a computer with Internet connection, hardwired telephone, long-distance telephone, fax machines, printer, and an I-Phone to receive messages and orders while in the field selling the walk-in bathtubs.

16. All leads/appointments were made by Premier and emailed or faxed to Plaintiff's home office the night before the lead/appointment. Any changes or new instructions were communicated from the company to Plaintiff. Plaintiff was inexplicably ordered by the Defendants to return to the same lead or appointment often three times or more.

17. These orders were usually and primarily given by Defendant Kelly, but occasionally others from Premier would call Plaintiff to tell him where to drive next if a change were necessary, including a return. Plaintiff was required to use his own vehicle to travel from lead/appointment to lead/appointment.

18. Only Premier would contact the homeowner. Plaintiff was forbidden from having the client's telephone number, thereby controlling the

activities of the Plaintiff and violating its own contract.

19. Contrary to the promises made by Defendant Kelly, Plaintiff was required to drive very far distances outside the described boundaries as described by Defendant Kelly. Plaintiff was promised a maximum one-way boundary of 80 miles from Plaintiff's home office. The leads/appointments all made by Premier and communicated to Plaintiff primarily by Defendant Kelly were to be scheduled in and around central New York State.

20. Unfortunately, from Plaintiff's home office, it was not unusual to be told to drive 120 miles or more. On one particular day, Plaintiff was required to drive a 400-mile-round trip. Both leads/appointments were to old mobile homes in the state of Pennsylvania.

21. During training, which was held in Rhode Island for three days, Plaintiff was informed by another sales representative named Bobby that Defendant Kelly conducts his own business. Moreover, Bobby stated that Kelly writes his own sales in New York State. Defendant Kelly only told Plaintiff he would travel to Texas for weeks at a time for recruiting and training. Plaintiff began to ask questions.

22. Plaintiff would ask occasionally why there were no leads/appointments in or near the Plaintiff's intended and promised sales as was represented by Defendant Kelly upon hiring. No answer was ever

provided.

23. The Plaintiff sold over $60,000 worth of business during his first month earning more than $6,000 in commissions. The records will show the actual addresses and locations the Plaintiff had to drive. Despite Plaintiff's success, the Plaintiff noticed a pattern with leads/appointments, only one or two in Plaintiff's intended/promised territory including Binghamton, Ithaca, and Cortland, out of more than a total of 100 as far away as 200 miles.

24. In September 2014, suddenly most of the leads/appointments made by Premier and assigned through Defendant Kelly were of very low quality. Many leads/appointments were in dilapidated mobile home parks or so far out with very meager incomes and home values. But the company had to respond to the leads/appointments or risk being accused of false advertising. Plaintiff never refused or complained but only asked why none were in other nearby areas like Ithaca, yet still made the drives.

25. A scheduler named Daniel at Premier informed the Plaintiff that Defendant Kelly determined whom gets what leads/appointments. It was clear Mr. Kelly was reserving better leads/appointments for himself since he continually does business in New York State.

26. Defendant Kelly maintained the records of Plaintiff's employment and at all times was in control over what leads/appointments Defendant Kelly to which

Plaintiff was assigned.

27. Defendant Kelly, being in control of the leads/appointments of Plaintiff, was in control over Plaintiff's compensation as the pay Plaintiff was to receive was based upon, in part, commissions from sales generated from those very leads/appointments Defendant Kelly was in control over.

28. Despite Plaintiff's immediate and continued success with Premier, he began to realize why he was hired in the first place.

29. It became clear that the Plaintiff was simply hired to run the leads/appointments that Defendant Kelly did not want to take, i.e., the old mobile homes, rough neighborhoods, far outlying areas and other low quality leads/appointments with little or no chance for a sale. The Plaintiff was hired to protect Premier and address all the bad leads/appointments, contrary to the promise of pre-qualified leads/appointments within 80 miles.

30. The Plaintiff requested the original signed contract on several occasions including in two emails. Plaintiff was ignored by Defendant Kelly. The Plaintiff never received the signed contract until ordered to produce it by the Federal Court, received by Plaintiff on November 13, 2015.

31. The Plaintiff's commission schedule was dropped from 12 to 10 and from 7 to 5 percent lacking notice, with no explanation from Defendant Kelly. There were no complaints of any kind from anyone, including the Defendants,

while the Plaintiff continued to do an outstanding job.

32. Again, the Plaintiff requested the signed contract which was never forwarded. In that email and subsequent telephone calls the Plaintiff informed Defendant Kelly that his actions and those of Premier seemed illegal and contrary to any agreement. Further, the Plaintiff gathered information from the New York State Department of Labor which was communicated to Bill Kelly on October 15th, 2014.

33. On October 16, 2014 Defendant Kelly sent an email advising the Plaintiff was going to receive a letter from Defendant Premier regarding the termination of Plaintiff's employment.

34. Defendant Kelly, by email, terminated Plaintiff, though Defendant wrongfully categorized Plaintiff as an independent contractor; as determined by the New York Department of Labor, Plaintiff was clearly an employee of Premier. Defendant Kelly had the power to fire Plaintiff and did fire Plaintiff via email.

35. On October 17, 2014, the Plaintiff received a formal letter of termination by Vice-President Gary Reda. The only initial notice was the inability to log on to his appointments. Plaintiffs earned funds were withheld totaling over $5,000 for more than 7 months.

36. The signed contract was formally sent to the Plaintiff on

November 13, 2015, as ordered by the Court in the Northern District of New York. That was over one year after termination. The Plaintiff had never seen the signed contract until then. The original and first amended complaint filed with the Court on October 30, 2015, was devoid of important clauses and evidence contained therein due to lack of access to the contract. The Defendants chose to conceal the contract because it was and is incriminatory.

37. Defendant Kelly intentionally committed active concealment, withholding evidence and thus preventing the Plaintiff access to documents.

38. The Defendants wantonly, capriciously, fraudulently and egregiously violated and breached its own signed contract to the detriment of the Plaintiff as follows, including but without limitation:

> a) Item number 10a. Termination. (sic) Either party may terminate this Agreement, without cause and for any reason whatsoever, by giving written notice of termination to · the other party at least thirty (30) days prior to the effective date of termination, which shall be specified in such written notice;

> b) Item number 15. Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and hand delivered or sent by certified mail, return receipt requested, to the Contractor's residence, or to the principal office of the Corporation, as the case may be. The date of delivery for purposes of this Agreement shall be the date of hand delivery or the date of mailing. Notices will be sent to the address provided by Contractor and are assumed to be received. Contractor shall notify Corporation of any change of address.

> c) Item number 2. Independent Contractor. The Contractor is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an employer/employee relationship, a joint venture relationship, a partnership, or to allow the Corporation to exercise control or

direction over the manner or method by which the Contractor performs the Services (as hereinafter defined);

d) Item number 2a. The Corporation will not withhold from compensation on behalf of the Contractor pursuant to this Agreement any sums for income tax, unemployment insurance, social security or any other withholding.

e) Item number 3. Contractor's Duties and Responsibilities. The Contractor agrees to provide to Corporation those services as set forth below (the Services"). The parties agree that the Corporation shall have no control over the manner of Contractor's performance of Services; provided however, that all Services provided here under shall at all times comply with any and all applicable laws, statutes, regulations codes and ordinances, whether federal, state or local.

39. The Defendants treated the Plaintiff as an employee in violation of their own contract then terminated the Plaintiff in an obvious attempt to avoid legal scrutiny for misclassification violations on both the New York State and federal levels.

40. The deliberate concealment and refusal to provide a copy of the contract to the Plaintiff was to try and avoid consequences of improper misclassification of Plaintiff. The signed contract was never sent ordered by the Court and received by the Plaintiff on November 13, 2015, over one year after termination.

41. Defendant Kelly and Defendant Premiere misused and misled the Plaintiff trying to convert him to an independent contractor without compensation, benefits and all rights otherwise enjoyed by an employee.

42. Vice President Gary Reda sent the letter with no explanation other than the fact that the Plaintiff was terminated immediately and he would send the monies owed the Plaintiff upon installation. The units were already installed; the funds were never sent.

43. If the Plaintiff had not complained to various agencies, there is no question that he would have never gotten any of the money owed him. As it is there is still a balance of more than $2,000 that Defendants ignore. The Plaintiff complained to the New York State Department of Labor, which investigated the Plaintiff's claim for unemployment insurance. That process took more than 5 months to complete. Premier did not cooperate with the Labor Department and chose to hold the Plaintiff's funds 7 months until June of 2015. Some were never paid and are still owing. Premier demonstrated acts of fraudulent behavior, arrogance and disregard for the law.

44. Premier contested the ruling twice and rebuked each time. In spite of the signed contract, the ruling is that the Plaintiff was a bona fide employee. Defendants' concurrent breach of contract and intentional misclassification were both abundantly clear.

45. Further, the Department of Labor concluded that Premier had not only broken New York State law but federal laws as well.

46. On May 22nd, 2015, Premier Bath defaulted on the hearing before Administrative Judge Steven Kittleman. Premier was provided an extra 45 days to lobby the Appeal Board. They never responded during that time frame. The time expired.

47. Plaintiff was deemed to be an employee and not an Independent Contractor. Premier chose not pay unemployment fees, worker's compensation FICA fees, IRS taxes, Social Security, Medicare and other costs for the Plaintiff.

48. Defendant Kelly intentionally misrepresented the job he hired Plaintiff to do.

49. Upon termination, the Plaintiff was left with paying all the taxes and other costs as well. The Plaintiff was harmed by Defendants misclassification.

50. Defendant Kelly and Defendant Premier knew of its breaching the contract. Moreover, the named Defendants violated both federal and New York State public policy.

51. The Plaintiff's written request for a copy of the signed contract and explanation of the commission reduction, absent any notification and Plaintiff's subsequent appeal to the New York State Labor Board, was met with clear and immediate retaliation by Defendant Kelly.

52. Defendant Kelly, via email, terminated the Plaintiff on October 17, 2014, within 12 hours for asking relevant questions in violation and certain breach of

the contract.

53. Subsequently, Defendant Premier issued a formal letter of termination.

54. In New York State, the initial determination of unemployment can have the same effect as an 'reverse audit,' once it is upheld by the administrative judge. This case was upheld by the Administrative Judge, Steven Kittleman on May 22, 2015 and again by default of Premier Care in Bathing on July 11th, 2015.

55. The Plaintiff, upon information and belief, believes he was singled out, misused and abused as a lackey to carry out the work for Defendant Kelly in particular and Defendant Premier in general to protect their marketing and advertising interests. Further, based upon so called jokes by Defendant Kelly the Plaintiff is informed and believes that he was singled out due to Plaintiff's age and ethnicity.

56. Defendant Kelly is Caucasian and the Plaintiff is African American.

57. The Plaintiff was gainfully employed and left his previous position to take the job and promises offered by Defendant Kelly and Defendant Premier.

58. Further, Plaintiff informed Defendant Kelly, based upon his background, the job fits well and this could be his last career. Defendant Kelly stated the walk-in bath sale is "just a simple conversation" with no traditional presentation or demonstration.

59. Defendant Kelly also stated the Plaintiff could work for their company for many years and was anxious to have him on board.

60. The Plaintiff's reputation has been irreparably damaged and he could not find suitable employment.

61. Due to the difficult circumstances Defendant Kelly and Defendant Premier has put the Plaintiff into, the financial strain due to Defendant Kelly's representation Plaintiff would make $90,000 annually, inability to secure suitable employment after termination, failure of Defendants to provide payment for services and sales owed to the Plaintiff, Plaintiff has suffered damages.

## CAUSES OF ACTION

### I.   Fair Labor Standards Act ("FLSA"): Failure to Pay Wages and Overtime Compensation Against All Defendants

62. Paragraphs 1 through 61 are incorporated herein as if set forth in full herein.

63. At all relevant times, Defendant Kelly and Defendant Premier have and continue to be employers within the meaning of the FLSA.

64. At all times relevant herein, Defendants were responsible for paying wages to Plaintiff.

65. At all times relevant herein, Defendant Kelly was in direct and exclusive control over the Plaintiff by determining:

    a.    what leads/appointments were provided to Plaintiff;

    b.    what territory Plaintiff was to work in;

    c.    what customer lists Plaintiff was provided and when;

    d.    reviewed contracts Plaintiff submitted;

    e.    reviewed and critiqued daily reports;

    f.    dictated sales methods to be used; and

    g.    what compensation Plaintiff would receive and his rate of pay.

66. At all times relevant herein, Plaintiff was employed with Defendant Premier and was an employee within the meaning of the FLSA.

67. At all times relevant herein, Defendant Kelly was in exclusive control over compensation Plaintiff was to receive by virtue of his exclusive ability to assign leads/appointments to Plaintiff since it is a commission based pay scale.

68. Defendant Kelly determined that certain leads/appointments would not go to Plaintiff and that only Defendant Kelly would have communication with anyone in operations of the Company so as to conceal what was going on to Plaintiff.

69. Plaintiff began questioning Defendant Kelly and escalating the matter to higher up, and that is when Defendant Kelly advised Plaintiff he was terminated and would receive a letter from Defendant Premier, confirming same.

70. Defendant's violations of the FLSA include, but are not limited to, unlawfully failing to pay hourly wages due to Plaintiff and unlawfully failing to pay overtime wages due to Plaintiff.

71. Defendants' conduct in failing to pay Plaintiff properly was willful and was not based upon any reasonable interpretation of the law.

72. As a result of Defendants' unlawful conduct, Plaintiff has suffered damages as set forth herein.

WHEREFORE, Plaintiff, CHARLES CRABLE, requests the entry of judgment against Defendant Premier and Defendant Kelly, jointly and severally, for:

    a) Unpaid minimum wages, overtime wages, penalties and interest;

    b) Liquidated damages pursuant to the FLSA;

    c) General, compensatory, and special damages;

    d) Punitive damages;

    e) Attorneys' fees and costs; and

    f) for such other and further relief as the Court deems just and proper.

**II.   Labor Standards Act ("FLSA")   Wrongful Termination Against All Defendants**

73. Paragraphs 1 through 61 are incorporated herein as if set forth fully

herein.

74. Plaintiff relied upon the obligation of good faith and fair dealing in the contract and relied on the fact that his employment would not be terminated for an illegal purpose or to avoid legal scrutiny.

75. Plaintiff, at all times, fully complied with the terms and conditions of his employment.

76. Defendant Kelly, in his email of October 16, 2014, informing Plaintiff he was terminated, did not terminate Plaintiff's employment for performance reasons Defendants breached their own contract in violation of contract items 10 and 15 in particular and five others in general.

77. Plaintiff was terminated on October 16, 2014 because of his inquiries and contacting the New York State Department of Labor.

78. The Defendant Premier and Defendant Kelly have caused damage to the Plaintiff.

79. There is a causal connection between Plaintiff's inquiries regarding leads/appointments outside of the agreed upon territory and Defendant Kelly's email termination.

80. The termination was based on retaliation for the inquiries by the Plaintiff against Defendant Kelly.

81. Due to the wrongful termination, Plaintiff suffered emotional distress,

mental anguish, humiliation, harm to reputation, anxiety, depression, and stress.

WHEREFORE, Plaintiff respectfully prays that this Court enters judgment against Defendants, and each of them, jointly and severally, for:

a) Unpaid minimum wages, overtime wages, penalties and interest;

b) Liquidated damages pursuant to the FLSA;

c) General, compensatory, and special damages;

d) Punitive damages;

e) Reasonable fees and costs; and

f) for such other and further relief as the Court deems just and proper.

Dated this 27 day of December, 2016.

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 27, 2016, the foregoing was filed using the CM/ECF which will send electronic notification to: William Pringle, III, Esquire, 255 S. Orange Ave., Suite 1200, Orlando, Florida 32801; and via regular U.S. Mail to Premier Baths, 2330 A South Nova Road S. Daytona, Florida.

*/s/ Elizabeth J. Anderson*
ELIZABETH J. ANDERSON, ESQUIRE
Florida Bar No.: 0626351
Anderson Hew PLLC
201 S. Orange Avenue, Suite 900
Orlando, Florida 32801
Telephone: 407-545-6429
Emails: eanderson@andersonhew.com
Counsel for Plaintiff